# Exhibit H

Page 1

```
 1                IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

 2                          STATE OF HAWAII

 3
    MIGNONETTE OLIVAS,              ) Civil No. 19-1-0105-01 GWBC
 4                                  )
              Plaintiff,            )
 5                                  )
         vs.                        )
 6                                  )
    CUTTER CJD, INC. (d/b/a CUTTER  )
 7  DODGE CHRYSLER JEEP PEARL CITY) )
    FCA US LLC (d/b/a CHRYSLER      )
 8  CORPORATION and CHRYSLER GROUP  )
    LLC) and DOE DEFENDANTS 1-10,   )
 9                                  )
              Defendants.           )
10  _____)

11

12

13                         DEPOSITION OF

14                       MIGNONETTE OLIVAS

15

16  Taken on behalf of Defendant at 700 Bishop Street, 15th Floor,

17  Honolulu, Hawaii commencing at 9:35 a.m. on Monday, August 5,

18  2019, pursuant to Notice.

19

20

21

22

23

24

25  BEFORE:   MARY ANNE YOUNG, RPR, CSR No. 369
```

**EXHIBIT "H"**

## Page 2

```
 1  APPEARANCES:
 2  For Plaintiff:
 3       LAW OFFICE OF JUSTIN A. BRACKETT
         BY: JUSTIN A. BRACKETT, ESQ.
 4       WALTER CORONEL
         515 Ward Avenue
 5       Honolulu, Hawaii  96814
         (808) 377-6778
 6
 7  For Defendant FCA US LLC:
 8       TORKILDSON KATZ HETHERINGTON HARRIS & KNOREK
         BY: BRIAN W. TILKER, ESQ.
 9       700 Bishop Street, 15th Floor
         Honolulu, Hawaii  96813
10       (808) 523-6000
11
    For Defendant CUTTER CJD, INC:
12
         COX FRICKE, LLP
13       BY: ABIGAIL M. HOLDEN, ESQ.
         800 Bethel Street, Suite 600
14       Honolulu, Hawaii  96813
         (808) 585-9440
15       aholden@cfhawaii.com
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
      E X H I B I T S
NO.   DESCRIPTION                              PAGE
 7    Invoices                                  66
      32 pages

 8    Notice of Consumer Rights Under Hawaii's  138
      Lemon Law for New Motor Vehicles
      6 pages

 9    Lending/Typical Listing Breakdown Kelley  189
      Blue Book Effective Dates 3/20/2018 to
      4/5/2018
      1 page

10    First Service Appointment Form            195
      1 page

11    Photographs                               211
      25 pages

12    New Customer Customer Assistance Inquiry  237
      Record
      2 pages
```

## Page 3

```
        I N D E X

EXAMINATION:                          PAGE
   By Mr. Tilker                 5, 171, 263
   By Mr. Brackett                  170, 260
   By Ms. Holden                    172, 262


        E X H I B I T S
NO.   DESCRIPTION                          PAGE
 1    Amended Complaint, Exhibits A-E,       16
      Verification of Complaint, Summons
      32 pages
 2    Vehicle Sales Agreement                20
      4 pages
 3    Plaintiff's Responses and Objections   46
      to Defendant FCA US LLC's First Request
      for Answers to Interrogatories to
      Plaintiff Mignonette Olivas Dated May 1,
      2019, Certificate of Service
      16 pages
 4    Important Safety Recall, Reprogram     48
      Powertrain Control Module
      1 page
 5    Plaintiff's Supplemental Responses and 61
      Objections to Defendant FCA US LLC's
      First Request for Answers to Interrogatories
      to Plaintiff Mignonette Olivas Dated May 1,
      2019, Certificate of Service
      9 pages
 6    Credit Sale Contract - Motor Vehicle - 64
      Simple Finance Charge (With Arbitration
      Provision)
      4 pages
```

## Page 5

```
 1            MIGNONETTE OLIVAS,
 2  called as a witness at the insistence of the Defendant,
 3  being first duly sworn to tell the truth, the whole
 4  truth and nothing but the truth, was examined and
 5  deposed as follows:
 6              EXAMINATION
 7  BY MR. TILKER:
 8     Q   Ms. Olivas?
 9     A   Olivas.
10     Q   Olivas, okay.  My name is Brian Tilker.  I
11  represent Defendant FCA US LLC.  Sitting next to me is
12  Abigail Holden.  She represents Cutter.
13         You understand those are two separate parties
14  in the case?
15     A   Yes.
16     Q   Would you please state your full name for the
17  record?
18     A   Mignonette Nicole Olivas.
19     Q   Have you ever had your deposition taken
20  before?
21     A   No.
22     Q   Okay.  So I'll go through a few of the kind of
23  ground rules and explain to you what's going on today to
24  make sure we're on the same page.
25     A   Okay.
```

Page 142

1    Q   Okay.  Do you remember earlier we discussed
2  the vehicle purchase agreement with Cutter?
3    A   Uh-huh.
4    Q   The credit sales agreement with Cutter?
5      Do you remember that?
6    A   Yes.
7    Q   Is it fair to describe those as written
8  contracts?
9    A   Yes.
10    Q   Okay.  Do you have any written contracts with
11  FCA US that you are personally aware of?
12    A   I don't know.  I don't -- I mean, if it was
13  something that is part of when I bought this vehicle,
14  then yes.  If not, then no.  I don't know of any.
15    Q   Okay.  In other words, if there was one that
16  exists, a written contract that exists with FCA, it
17  would be part of the documents you received when you
18  purchased the vehicle?
19    A   Yes.
20    Q   Okay.  Have you ever taken the car -- I think
21  you answered this earlier, but have you ever taken this
22  vehicle to any independent examiner?
23    A   No, sir.
24    Q   Okay.  So you don't have any independent
25  analysis currently of whether there is a defect that

Page 143

1  substantially impairs the use, safety or value of the
2  vehicle?
3    A   No, sir.
4    Q   Understood.
5      Let's look at the amended complaint again,
6  Exhibit 1.  Now, we asked -- this was an issue that I'll
7  represent is, I think, still, you know, pending
8  discovery issue between the parties.  You know, you have
9  different claims here, right, Ms. Olivas, and I know you
10  may not understand what these claims mean.
11      Do you understand what the Magnuson-Moss
12  Warranty Act is?
13    A   I have no clue what that even -- no, no.
14    Q   I understand.
15      MR. BRACKETT:  Calls for a legal conclusion.
16      MR. TILKER:  Well, I just asked if she knows
17  what it is, not anything else.
18      THE WITNESS:  No.
19  BY MR. TILKER:
20    Q   Okay.  That's fine.  But if we turn to
21  page 13, do you see that claim?
22    A   Which, the one you just asked me about?
23    Q   The eighth claim for relief, Magnuson-Moss
24  Warranty Act.
25      Do you see that?

Page 144

1    A   Yes, sir.
2    Q   Let's just go to paragraph 75, okay?
3    A   Okay.
4    Q   It says, "As a result of Defendants' breaches
5  of express and implied warranties as set forth in this
6  complaint and their failure to remedy same competently
7  and timely, Plaintiff has suffered the damages
8  enumerated above."
9      Do you see that?
10    A   Yes, sir.
11    Q   Okay.  So I started looking for damages
12  enumerated above to see what we're talking about, right,
13  and I found above paragraph 59, so if you go back two
14  pages to page 12, it says here, "As a direct and
15  proximate result of Defendants' various breaches of
16  warranty, Plaintiff has suffered damages including, but
17  not limited to the cost of his vehicle."
18      MR. BRACKETT:  Sorry.  I accidently said
19  "his," instead of "hers."
20      MR. TILKER:  Yeah, I noticed that.  That's
21  okay with me.
22      THE WITNESS:  Not me.
23      MS. HOLDEN:  I didn't even notice.  I don't
24  know what that says about me.
25      MR. TILKER:  I was just letting it go.  Okay.

Page 145

1  Let me just repeat that again.
2  BY MR. TILKER:
3    Q   "As a direct and proximate result of
4  Defendants' various breaches of warranty, Plaintiff has
5  suffered damages including, but not limited to," colon,
6  "the cost her vehicle, the inconvenience of obtaining
7  alternative transaction, anxiety, embarrassment, anger,
8  fear, frustration, disappointment, worry, aggravation,
9  and she will continue to suffer future damages together
10  with costs and fees to obtain relief from Defendants'
11  wrongful conduct."
12      So I just want to kind of go through these
13  with you.
14    A   Yeah.
15    Q   We know the cost -- the cost of the vehicle
16  refers to, I assume, sort of the total purchase price,
17  which was $40,448.76, correct?
18    A   Yes, sir.
19    Q   Okay.  Anything else besides that when we talk
20  about the cost of the vehicle?
21    A   I don't --
22    Q   I'm looking at paragraph 17 of the complaint
23  which describes, you know, the purchase price of
24  $35,698.76, plus automotive theft protection of 220,
25  plus supreme care synthetic package of 586, gap

Page 146

1    insurance of 895, general excise tax of $1,339.33,
2    government license fee of $377.43, dealer documentary
3    fee of $295, minus a manufacturer rebate of $2,750, a
4    total cash down-payment of $1,950, and a net trade
5    equity of $50. So that's how I'm assuming your counsel
6    came up to $40,448.76.
7         Is there any other expenses you're aware of
8    that you had to pay when you purchased the vehicle
9    originally?
10    A    Not that I can recall without looking at the
11    exact --
12    Q    Okay. Okay. So the best of your
13    understanding when we're talking about the cost of the
14    vehicle, it's at $40,440?
15    A    I believe so.
16    Q    The next one says "the inconvenience of
17    obtaining alternative transportation."
18         Is that something that is at issue in this
19    case?
20    A    Inconvenience of obtaining alternative
21    transportation.
22    Q    Does that refer to the inconvenience of
23    obtaining rental vehicles?
24    A    Yeah, that was a total inconvenience, and I'm
25    driving a soccer mom car when I bought a brand new

Page 147

1    Challenger. It's a huge inconvenience.
2    Q    Do you have a believed value as to that
3    inconvenience, your personal belief as to the value?
4    A    I don't have a value, no, sir.
5    Q    And what about anxiety?
6    A    I have anxiety because if I'm thinking I have
7    a $40,000 loan on a vehicle and the value is going to be
8    depreciated, I still have to pay that. I still have to
9    be responsible for that.
10    Q    Do you have any kind of monetary value that
11    you believe would be appropriate --
12    A    No, sir.
13    Q    -- for the anxiety you're suffering?
14    A    I don't. No, sir.
15    Q    What about embarrassment, is that the soccer
16    mom car concept?
17    A    Well, it's embarrassing that I went to a
18    dealership, bought a brand new vehicle, and for how many
19    months I'm driving not that. Like it's just -- just to
20    even say that, "Hey, I bought this brand new car that
21    nobody else has owned and it needs a new transmission,"
22    that's embarrassing, like to say at least.
23    Q    Do you have a thought as to the monetary
24    amount you would ascribe to that?
25    A    No, sir.

Page 148

1    Q    Anger, fear, frustration, disappointment,
2    worry, aggravation: Do these all fit into the same
3    categories?
4    A    It all fits. You just buy a brand new car and
5    you don't want to have to -- nobody should experience
6    that, that kind of money and a brand new car and have to
7    go through this a couple months later.
8    Q    Okay. Do you have any monetary value you
9    believe is fair for the alleged anxiety, embarrassment,
10    anger, fear, frustration, disappointment, worry and
11    aggravation?
12    A    I don't know. I just -- I tried to make this
13    right in the very beginning with the dealership and
14    nobody wanted to make this right. I didn't create this.
15    Q    When we talk about -- and it says, "She will
16    continue to suffer future damages."
17         Do you know what damages you're referencing?
18    A    I'm probably referencing that, again, a
19    $40,000 loan. If this car is depreciated, I'm stuck
20    with that. You know, besides the transmission, also
21    brand new paint that needs to be done, like I'm going to
22    be stuck with all of this. I didn't do any of this. I
23    took the vehicle to have a transmission fixed and ended
24    up with even more problems, and a transmission is still
25    not fixed. It's not right.

Page 149

1    Q    So is one of your beliefs that you'll have to
2    paint the car at your own expense?
3    A    Oh, I'm going to have to do that as well.
4    Q    Do you know how much that would cost?
5    A    I have no clue, but I can find out.
6    Q    Do you have a guess?
7    A    No. I've never bought a brand new car and
8    have to have it painted.
9    Q    Okay. When we say "together with costs and
10    fees to obtain relief from Defendants' wrongful
11    conduct," are we talking about the costs and fees
12    associated with your attorney pursuing this case?
13         Is that your understanding of what this means?
14    A    I don't know the legal term that's -- I don't
15    know.
16    Q    You don't know what that means; is that fair?
17    A    That's fair.
18    Q    And there's a -- so you're seeking under -- so
19    when we look again back to the Magnuson-Moss claim and
20    we talk about the categories that Plaintiff has
21    suffered, the damages enumerated above and we refer to
22    all these issues, we went over, you know, the total
23    price of the vehicle. You want $40,448.76; is that
24    correct?
25    A    If that's the total of the vehicle.

Page 150

1   Q   That's the total --
2   A   Yes.
3   Q   -- of the vehicle with all the extras.
4   A   Yes, sir.
5   Q   Okay.  You're --
6       MR. BRACKETT:  You're referring to the
7   purchase price.
8       THE WITNESS:  I believe so.
9       MR. TILKER:  The total purchase price.
10      MR. BRACKETT:  Yes.
11      THE WITNESS:  Okay.  Then yes.
12  BY MR. TILKER:
13  Q   Okay.  Amounts that would be satisfactory to
14  allow you to recuperate (sic) the damage you suffered
15  for obtaining alternative transportation, and the
16  anxiety and embarrassment and fear and anger and
17  emotional damages you've suffered, but you don't know
18  the exact amount?
19  A   No, I --
20  Q   As well as you would -- are you seeking
21  compensation for issues that still need to be addressed
22  with the car, like painting it?
23  A   Yeah, all of it.  Like, it's still --
24  everything is still an issue from day one.  None of this
25  has been taken care of.  My vehicle still makes the

Page 151

1   knocking.  The paperwork shows the transmission wasn't
2   fixed; something else was.  The scratches are still
3   there.  Voice mails are on the phone saying, "Hey, go
4   ahead and take care of this," and nobody's done it.
5   Q   Okay.
6   A   And this has been since last summer.
7   Q   Are you able to provide me with any other
8   information in terms of monetary amounts that would make
9   up the types of damages you're seeking in this case?  In
10  other words, we've talked about the categories of
11  damage:  "I'm trying to recover for the inconvenience,
12  I'm trying to recover for the emotional stress this has
13  caused me," things like that.
14      Are you able to ascribe monetary values to any
15  of those categories other than the total purchase price?
16  A   I don't -- I don't think I understand.
17  Q   Okay.  Let me -- I understand that.
18  A   I don't.
19  Q   Let me -- I understand that you don't
20  understand.
21  A   Okay.
22  Q   You know, I'm just trying to get at are you
23  capable, you know, as you sit here today of putting
24  dollar values on the damages that you're seeking in this
25  case?  We know you're seeking approximately $40,000,

Page 152

1   which is the replacement -- the cost of the car that you
2   want -- you're ready to give the car back, right, but
3   you want your purchase price back, right?  It sounds
4   like you would want adequate amounts to pay for things
5   you think need fixed in the car like the paint, correct?
6   A   Like the paint and the knocking noise,
7   correct.
8   Q   The knock noise?
9   A   Yeah.
10  Q   But what about all these other categories,
11  inconvenience, embarrassment, et cetera?
12      MR. BRACKETT:  Objection.  Calls for a legal
13  conclusion.  Answer as best you can.
14  BY MR. TILKER:
15  Q   Yeah, either --
16  A   I don't know, Justin, what --
17      MR. BRACKETT:  Answer as best you can.
18      THE WITNESS:  I'm not sure.
19  BY MR. TILKER:
20  Q   Are you seeking to recover over or under
21  $50,000 or is the answer you don't know?
22  A   It was over 50 from what I recall.
23  Q   Okay.  And for the Magnuson-Moss claim in
24  particular --
25  A   I don't know.

Page 153

1   Q   Are you okay?
2   A   Yeah, it just makes me nervous.
3   Q   I'm sorry that it makes you nervous.  That's
4   not my goal.
5   A   I just want this right.  Like this is so
6   messed up.  Who spends that much money on a car?  And I
7   don't want to be here.  I don't want to do anything of
8   this.  I want it right.  It's just who pays 600
9   something dollar car payment?  It's just shitty.  It's
10  not right.
11      MR. TILKER:  Do you want to take a couple
12  minutes, Justin?
13      MR. BRACKETT:  Yes, let's take a couple
14  minutes.  Thank you, Brian.
15      (Whereupon, a short break was taken)
16  BY MR. TILKER:
17  Q   Back on record.  Ms. Olivas, going back to
18  paragraph 75 of the amended complaint.
19      So I guess my first question is when we say --
20  when you say paragraph 75, "Plaintiff has suffered the
21  damages enumerated above," is that in reference to all
22  those categories of damages we just discussed, like
23  anger, embarrassment?  Those are the only ones I see so
24  I'm trying to --
25      MR. BRACKETT:  Objection.  Calls for a legal

Page 154

1  opinion, but go ahead and answer as best you can.
2      THE WITNESS:  Well, my answer the best I can
3  is I don't know.  I'm not an attorney.  I don't make the
4  paperwork.  I don't know what -- like I don't know.
5  We're referring to even a term of -- I don't know what
6  you said earlier, some -- oh, God, help me.  Yeah, this
7  Magnuson, I don't even know what that is.
8  BY MR. TILKER:
9      Q   Okay.  That's fair.
10     A   I don't even know.
11     Q   Nor do I expect you to.
12         Okay.  Let me simplify this for you.  Let's go
13  to page 16 of the complaint.
14     MR. BRACKETT:  I'm sorry, which?
15     MR. TILKER:  Page 16.
16     MR. BRACKETT:  Page 16, okay.
17     MR. TILKER:  It goes over to page 17.
18  BY MR. TILKER:
19     Q   Do you see on the bottom, it says, "As to the
20  eighth claim for relief, Magnuson-Moss Warranty Act"?
21  If you turn to the next page, it says, "That judgment be
22  awarded to Plaintiff in the amount of $40,448.76
23  together with additional damages to be determined."
24         Do you know as you sit here today what those
25  additional damages are?

Page 155

1      A   Other than what we discussed.
2      Q   Well, what I'm trying to get at is are those
3  additional damages what we discussed, the
4  inconvenience --
5      A   That's what I know them to be.
6      Q   Okay.  Understood.  Thank you.
7          And do you have in your mind as you sit here
8  today a value for those other damages?
9      A   No, sir.
10     Q   Okay.  Exhibit 2 -- I know I asked you this in
11  more generalized terms before, but I want to make sure
12  we're on the same page.  Exhibit 2 is the one that has
13  the one-page vehicle sales agreement and then the credit
14  sales agreement follows it.  I'm turning your attention
15  to the last page, Cutter and five zeros and the number
16  six.
17         Do you see that?
18     A   Uh-huh.
19     Q   Do you see where it says three boxes down,
20  "Agreement to arbitrate"?
21     A   Yes, sir.
22     Q   In that box where it says, "Buyer signs," I
23  just want to confirm that that's your signature?
24     A   I believe that's my signature.
25     MR. TILKER:  Okay.  I don't have any other

Page 156

1  questions at this time.
2      MR. BRACKETT:  All right.
3      MR. TILKER:  It's 1:21.  I mean, if we want to
4  take a break now, we can.  You know, if do you guys have
5  your thing you want to --
6      MR. BRACKETT:  Just a quick question.  As far
7  as you say you don't have any more questions at this
8  time, are you, like, saying you would like to come back
9  and question her this afternoon?
10     MR. TILKER:  No, no, I'm just reserving the
11  right in case something comes up, if further questions
12  are asked by Cutter or you and then it leads me to
13  something within that scope.  That's all.
14     MR. BRACKETT:  Sure.  I understand.  And I was
15  going to discuss the potential for maybe FCA US allowing
16  Cutter to assert some of its time today, but in all
17  actuality, I think Ms. Olivas is, the record has shown, is
18  pretty exhausted, and the unfortunate reality is
19  Cutter didn't notice the deposition today.
20         So along those lines, we, you know, will not
21  be proceeding with the deposition of Cutter until it is
22  properly noticed.  That's what the rules appear to say.
23  We can definitely negotiate -- or not negotiate, but,
24  you know, work together to get a convenient time for you
25  guys.  I know you prepared so I don't want to keep you

Page 157

1  waiting.  You're prepared now, Abbie, I'm sure, so along
2  those lines, we're okay with maybe allowing it in the
3  next week or two upon proper notice, and we can work
4  with you on the scheduling there so that hopefully it's
5  not way too inconvenient for you, so I apologize, but
6  the facts are what they are.
7      MS. HOLDEN:  Well, I do appreciate the
8  apology.  For the record, the notice, as Brian read into
9  the record, does invite other parties to come question.
10  I prepared, spent time out of my schedule.  You know, I
11  carved this time specifically out of, you know, a busy
12  schedule as everybody has, you know, to make the
13  consideration to do this before the travel to the
14  Mainland so, you know, I do really object to not being
15  able to question this afternoon.  I believe the rules
16  and the practice in this jurisdiction are clear.  In the
17  hundreds of depositions I've been to, I've never had
18  this been an issue before.  Codefendants are always
19  allowed to proceed with questioning without having to
20  separately notice.
21         Thus, to the extent that I do -- that we're
22  going to -- you know, you're refusing to allow
23  Ms. Olivas to testify pursuant to my questions this
24  afternoon, when I renotice the deposition, I will be
25  moving forward with costs and, additionally, so the

Page 266

1       MR. BRACKETT:  Is that it?

2       MS. HOLDEN:  Yes, unless do you want to do on

3  the record -- we already did the --

4       MR. BRACKETT:  And we do request a copy of the

5  transcript.

6       THE REPORTER:  Thank you.

7       MR. TILKER:  I think I already did that.  Off

8  the record.

9       (Discussion held off the record)

10      MS. HOLDEN:  Back on the record.

11      MR. BRACKETT:  Ms. Olivas, would you like to

12 review a copy of the transcript?

13      THE WITNESS:  Yes, please.

14      MR. BRACKETT:  Okay.

15      THE WITNESS:  But before we go, can I just,

16 like, look at this really quick in case I have a

17 question --

18      MR. BRACKETT:  I have a copy you can take with

19 you.

20      THE WITNESS:  But if I have a question, I

21 can't ask a question?  I can't?  Okay.  Never mine.

22      MS. HOLDEN:  Before we go off the record just

23 so --

24      THE WITNESS:  Yes.

25      MS. HOLDEN:  -- you are requesting a copy of

Page 267

1  your transcript.  If you make any changes to your

2  transcript and this case were to go to trial, Mr. Tilker

3  and I will be available -- be able to cross-examine you

4  regarding --

5       THE WITNESS:  Sure.

6       MS. HOLDEN:  -- any changes that you made --

7       THE WITNESS:  Sure.

8       MS. HOLDEN:  -- because the testimony you have

9  given today is under oath.

10      THE WITNESS:  Sure.

11      MS. HOLDEN:  Okay.

12      MR. TILKER:  Off the record.

13      MS. HOLDEN:  Off the record.

14      (The deposition was concluded at 5:07 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 268

1       I, MIGNONETTE OLIVAS, hereby certify that I have read

2  the foregoing typewritten pages 1 through 269, inclusive, and

3  corrections, if any, were noted by me, and the same is now a

4  true and correct transcript of my testimony.

5       DATED:  Honolulu, Hawaii, _____.

6

7

8       _____

9            MIGNONETTE OLIVAS

10

11

12 Signed before me this _____

13 day of _____, 20_____.

14

15 _____

16

17

18

19

20

21

22

23

24 Case:        Olivas vs. Cutter

   Civil No.:   19-1-0105-01 GWBC

25 Deposition Date: August 5, 2019

Page 269

1            C E R T I F I C A T E
2  STATE OF HAWAII          )
3                           ) SS:
4  CITY AND COUNTY OF HONOLULU   )
5
6     I, Mary Anne Young, Certified Shorthand Reporter, do
   hereby certify:
7
      That on August 5, 2019, at 9:35 a.m. appeared before me
   MIGNONETTE OLIVAS, the witness whose deposition is contained
   herein; that prior to being examined the witness was by me
9  duly sworn;
10     That the deposition was taken down by me in machine
   shorthand and was thereafter reduced to typewriting; that the
11 foregoing represents, to the best of my ability, a true and
   correct transcript of the proceedings had in the foregoing
12 matter;
13     That pursuant to Rule 30 (e) of Hawaii Rules of Civil
   Procedure,  a request for an opportunity to review and make
14 changes to this transcript:
15 _____ Was made by the deponent or a party (and/or their
          attorney) prior to the completion of the deposition.
16 _____ Was not made by the deponent or a party (and/or their
          attorney) prior to the completion of the deposition.
17 _____ Was waived.
18     I further certify that I am not an attorney for any of
   the parties hereto, nor in any way concerned with the cause.
19
      Dated this 18th day of August, 2019, in Honolulu, Hawaii.
20
21
22      _____
23            MARY ANNE YOUNG, CSR No. 369
24
25

```
 1          I, MIGNONETTE OLIVAS, hereby certify that I have read

 2     the foregoing typewritten pages 1 through 269, inclusive, and

 3     corrections, if any, were noted by me, and the same is now a

 4     true and correct transcript of my testimony.

 5          DATED:   Honolulu, Hawaii,  _____.

 6

 7

 8                        _____

 9                        MIGNONETTE OLIVAS

10

11

12     Signed before me this _____

13     day of _____, 20_____.

14

15     _____

16

17

18

19

20

21

22

23

24     Case:           Olivas vs. Cutter
       Civil No.:      19-1-0105-01 GWBC
25     Deposition Date: August 5, 2019
       Taken By:       Mary Anne Young         AUG 2 2 2019
```

RALPH ROSENBERG COURT REPORTERS, INC.                    268
Honolulu, Hawaii        (808) 524-2090

1                   C E R T I F I C A T E

2    STATE OF HAWAII                    )

3                                       ) SS:

4    CITY AND COUNTY OF HONOLULU        )

5

6        I, Mary Anne Young, Certified Shorthand Reporter, do
     hereby certify:
7
         That on August 5, 2019, at 9:35 a.m. appeared before me
8    MIGNONETTE OLIVAS, the witness whose deposition is contained
     herein; that prior to being examined the witness was by me
9    duly sworn;

10       That the deposition was taken down by me in machine
     shorthand and was thereafter reduced to typewriting; that the
11   foregoing represents, to the best of my ability, a true and
     correct transcript of the proceedings had in the foregoing
12   matter;

13       That pursuant to Rule 30 (e) of Hawaii Rules of Civil
     Procedure,  a request for an opportunity to review and make
14   changes to this transcript:

15    __X__  Was made by the deponent or a party (and/or their
            attorney) prior to the completion of the deposition.
16    _____  Was <u>not</u> made by the deponent or a party (and/or their
            attorney) prior to the completion of the deposition.
17    _____  Was waived.

18       I further certify that I am not an attorney for any of
     the parties hereto, nor in any way concerned with the cause.
19
         Dated this 18th day of August, 2019, in Honolulu, Hawaii.
20

21

22                       _____
                         MARY ANNE YOUNG, CSR No. 369
23

24

25


                 RALPH ROSENBERG COURT REPORTERS, INC.
                 Honolulu, Hawaii        (808) 524-2090

OCT 0 7 2019
hd

# WITNESS CORRECTION SHEET

**CASE: OLIVAS VS. CUTTER CJD, INC.; CIVIL NO. 19-1-0105-01 GWBC**

**DEPOSITION OF MIGNONETTE OLIVAS, TAKEN ON 8-5-19.**

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |

(If additional space is needed, attach a blank sheet)

Signature of Deponent: _____   Date: _____

========================================================================

## CERTIFICATE

☐   Please be advised that the deponent signed and/or made corrections to the deposition within 30 days of notification.

☒   Please be advised that 30 days have expired and the deponent has failed to read and sign the deposition.

☐   Please be advised that signature and/or corrections were received and are **not** **being** **filed** with the transcript because:

    ☐   the deponent failed to sign and/or make corrections within 30 days after notification that the transcript was available for review.

    ☐   a request for an opportunity to review the transcript was **not** made by the deponent or a party before completion of the deposition.

☐   Please be advised that the above-named case is going to trial and/or hearing and the deponent has **not** had 30 days to read and sign the deposition before the filing of this transcript with the Court.

DATED:      10-7-19, HONOLULU, HAWAII.

CSR NO. 179

*Ralph Rosenberg* by d.y.
**Ralph Rosenberg Court Reporters, Inc.**
*1001 Bishop Street, Suite 2460, Honolulu, HI 96813*
*Phone: (808) 524-2090  Fax: (808) 524-2596*